UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THREE COURT MASTER, L.P.

                                            Plaintiff,              Case No.:

   -  against -

UBS AG, STAMFORD BRANCH

                                            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT

### Nature of Action

1.    This is an action commenced by plaintiff Three Court Master, L.P. against defendant UBS AG, Stamford Branch based upon the defendant's multiple breaches of three loan participation agreements entered into with the plaintiff resulting in substantial damages to the plaintiff.

### The Parties and Jurisdiction

2.    Plaintiff Three Court Master, L.P. ("Plaintiff") is a limited partnership duly organized under the laws of Bermuda with its principal place of business located at 148 Madison Avenue, New York, New York 10010.

3.    Upon information and belief, defendant UBS AG, Stamford Branch ("Defendant") is a branch office of UBS, AG, a corporation organized under the laws of Switzerland located at 600 Washington Boulevard, Stamford, Connecticut 0690.

-1-

**Jurisdiction and Venue**

4. Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because the Plaintiff is a citizen of New York State and the Defendant is a citizen of a foreign state or a different state.

5. The exercise of personal jurisdiction in New York by this Court over the Defendant and venue in this District is proper pursuant to written agreement by the parties.

**General Allegations**

6. Pursuant to a Participation Agreement between Plaintiff, as buyer, and Defendant, as seller, dated September 27, 2024 (the "First Participation Agreement"), the Plaintiff was granted a participation interest in the principal amount of $2,992,346.94 in Defendant's loan (the "UBS Loan") to borrower, Naked Juice LLC ("Naked Juice") in the First Lien Credit Agreement dated as of January 24, 2022 among, Bengal Debt Merger Sub, LLC, a Delaware limited liability company, which merged with Naked Juice LLC, a Pennsylvania limited liability company, as the Parent Borrower, New Tiger Holdings LLC, as Holdings, each lender from time to time party thereto, as Lenders, each L/C issuer thereto and UBS AG Cayman Islands Branch, as Administrative Agent, Collateral Agent and L/C Issuer (the "Credit Agreement").

7. Pursuant to a Participation Agreement between Plaintiff, as buyer, and Defendant, as seller, dated December 6, 2024 (the "Second Participation Agreement"), Plaintiff was granted an additional participation interest in the UBS Loan in the Credit Agreement in the principal amount of $750,000.

8. Pursuant to a Participation Agreement dated December 9, 2024 between Plaintiff, as buyer, and Defendant, as seller, (the "Third Participation Agreement"), Plaintiff was granted an additional participation interest in the UBS Loan in the principal amount of $500,000 (the First,

Second and Third Participation Agreements shall be collectively referred to as the "Participation Agreements").

9. The aggregate principal amount of participation interests granted to Plaintiff in the UBS Loan under the Participation Agreements is $4,242,348.94 (the "Participation Interests").

10. The Participation Agreements incorporate and are governed by the Standard Terms and Conditions of the Loan Syndication and Trading Association ("LSTA") (the "LSTA Standard Terms").

11. Sections 6, 11, 12 and 15 of the LSTA Standard Terms state in relevant part:

> 6.1 Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "Buyer Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that any Buyer Indemnitee incurs or suffers as a result of, or arising out of a breach of any of Seller's representations, warranties, covenants or agreements in this Agreement.
>
> **11. Voting**
>
> 11.1 The provisions of the subsection of this Section 11.1 specified in Section F of the Transaction Specific Terms shall apply to the Transaction [providing that for purposes of determining the Majority Holders as specified in Section 11.1(a) below, the interests or claims held by the Defendant for its own account shall be counted and the interests or claims of Affiliates shall not be counted:
>
> (a) On and after the Settlement Date, Seller (i) shall not take (or refrain from taking) any action with respect to the Transferred Rights and Assumed Obligations (an "Act") other than in accordance with the prior instructions of Buyer and (ii) shall take (or refrain from taking) any Act with respect thereto in accordance with the prior instructions of Buyer; provided, however, that (x) if the Act involved is not divisible in respect of the Participation but may be made only in respect of all loans and commitments held by Seller under the Credit Agreement ("Seller's Claims"), then Seller shall take such Act in accordance with the direction (if timely given) of holders (including Seller, if applicable) owning or holding interests representing more than 50% of the total amount of Seller's Claims (the "Majority Holders"); or (y) if the Act arises after the commencement of a bankruptcy, insolvency or a similar proceeding

      relating to Borrower and/or any Obligor, and is not divisible in respect of all loans and commitments that Seller may own from time to time under the Credit Agreement, but is divisible in respect of all claims of the same class that Seller may have against Borrower and/or any Obligor, then Seller shall take such Act in accordance with the directions (if timely given) of the majority (including Seller, if applicable) of holders (the "<u>Majority Claims Holders</u>") in respect of all such claims (measured by amount of claims).  For purposes of determining the Majority Holders or Majority Claims Holders pursuant to the preceding sentence, (i) the interests or claims held by Seller for its own account and the interests or claims held by Affiliates of Seller shall be counted or not counted as specified in Section F of the Transaction Specific Terms, and (ii) Seller shall only be required to obtain instructions relating to any Act to be taken in respect of the Transferred Rights and Assumed Obligations from (x) Buyer or (y) if Seller has consented to transfers of the Transferred Rights (or any portion thereof) pursuant to Section 10.1(b), the then current holders of the aggregate principal amount of the claims outstanding in respect of which such Act is to be taken by Seller.  Buyer acknowledges that it shall be bound by any decisions of the Majority Holders or the Majority Claims Holders, as the case may be, to take or not take an Act.  Notwithstanding anything to the contrary in this Section 11, Seller may refuse to follow the instructions of Buyer or the Majority Holders or the Majority Claims Holders, as the case may be, if (A) following such instructions might (in Seller's reasonable determination) expose Seller to any obligation, liability or expense that in Seller's reasonable judgment is material and for which Seller has not been provided adequate indemnity or (B) Seller reasonably determines that following the instructions could violate any applicable law, rule, order or the Credit Documents (and such restrictions or prohibitions are hereby incorporated by reference as if set forth herein).

11.2    Any consent, instruction or other direction of Buyer permitted under Section 11.1 must be in writing and shall not be effective unless received by Seller no later than one (1) Business Day prior to the date on which such direction must be taken by Seller; <u>provided</u>, <u>however</u>, that if Seller gives notice to Buyer of the Act that is to be taken less than one (1) Business Day prior to the time when such Act is to be taken and Buyer gives a consent or other direction to Seller prior to the time when such Act is to be taken, Seller shall make commercially reasonable efforts to take into account such direction with respect to such Act. Absent such timely consent or other direction (including the withholding of such consent) from Buyer, Seller shall be entitled (but not required), in its sole discretion, to deem that Buyer has given its consent to take (or refrain from taking) any Act on behalf of

Buyer with respect to such matters; <u>provided</u>, <u>however</u>, that in doing so, Seller shall act in good faith and subject to the provisions of Section 12.

**12.    Standard of Care**

12.1    Seller [Defendant] will not be held to the standard of care of a fiduciary but will exercise the same duty of care in the administration and enforcement of the Participation and the Transferred Rights it would exercise if it held the Transferred Rights solely for its own account, **[the "Standard of Care"]** and except for losses that result from Seller's bad faith, gross negligence, willful misconduct or breach of any of the express terms and provisions of this Agreement, it shall not be liable for any error in judgment or for any action taken or omitted to be taken by it.  Seller may rely on any notice, consent, certificate, request or other written document or communication received by Seller from Buyer or any employee or agent of Buyer and believed by Seller in good faith to be genuine.[emphasis supplied]

12.2    Seller (i) may rely on legal counsel (including counsel for Borrower, the Agent or any other Lender), independent public accountants and other experts selected or accepted in good faith by Seller (collectively, the "<u>Experts</u>") and Seller shall not be liable for any action taken or omitted to be taken in good faith by Seller in accordance with the advice of such Experts, (ii) may serve as a member of a creditors' committee performing such acts as may be authorized and vote (subject to Section 11 hereof) as a member of a designated class of creditors for a plan of reorganization related to the Transferred Rights, (iii) shall be entitled to rely on, and shall incur no liability by acting upon, any conversation, notice, consent, certificate, statement, order, or any document or other writing (including, without limitation, facsimile, electronic mail, or other telecommunication device) believed by Seller to be genuine, (iv) except as expressly set forth in Section 4, makes no warranty or representation (express or implied) and shall not be responsible for any statement, warranty or representation made in connection with the Credit Agreement or any related document or for the financial condition of Borrower, (v) shall not have any duty to inspect the property (including the books and records) of Borrower or any Obligor, (vi) except as provided in Section 11, and subject to the standard of care set forth in Section 0, shall have no obligations to make any claim, or assert any lien upon, any property held by Seller or assert any offset in respect thereto, (vii) shall have no duties or obligations hereunder other than those expressly provided for herein and (viii) shall have no obligation to take any action which Seller determines in good faith could violate applicable law, rule, regulation, order, the Credit Agreement or other Credit Documents or, in Seller's reasonable judgment, prejudice Seller's continuing relationship with any regulatory authority or damage Seller's reputation or, unless and until it shall have been provided adequate indemnity therefor, expose Seller to any material obligation, liability or expense.

12.3　Except for reports and other documents and information expressly required to be furnished to Buyer pursuant to Sections 9.2 and 9.3 above, Seller shall not have any duty or responsibility to provide Buyer with any credit or other information concerning the affairs, financial condition or business of Borrower or any Obligor which may come into the possession of Seller or any of its Affiliates.

12.4　Notwithstanding Sections 12.1, 12.2 and 12.3 above, nothing in this Section 12 shall relieve Seller from any liability for its breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

**15.　Elevation**

15.1　Subject to the terms and provisions of the Credit Documents and any applicable law or regulation, if:

(i)　"Yes" is specified opposite "Elevation" in the Transaction Summary, upon the request of either Party, **[Yes was specified]**

(ii)　"No" is specified opposite "Elevation" in the Transaction Summary, upon the request of the Party entitled to request an Elevation pursuant to Section G.2 of the Transaction Specific Terms and, in the case of a request by Buyer, upon satisfaction of the conditions set forth in Section G.2 of the Transaction Specific Terms, or

(iii)　regardless of any specification opposite "Elevation" in the Transaction Summary, either Seller or a direct or indirect parent company of Seller, (A) has become the subject of a proceeding under any Debtor Relief Law, or (B) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Entity charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other Governmental Authority acting in such a capacity, upon the request of Buyer, in each such case, each Party agrees to use commercially reasonable efforts and to take such actions as are necessary (including obtaining all Elevation Required Consents (if any)), as soon as reasonably practicable, to cause Buyer or any actual or prospective transferee or subparticipant with respect to all or any portion of the Participation who is mutually acceptable to the Parties (any such Entity or Buyer, a "<u>Permitted Assignee</u>") to become a Lender under the Credit Agreement with respect to all or any part of the Transferred Rights (an "<u>Elevation</u>"; and the date on which such Permitted Assignee becomes a Lender under the Credit Agreement, the "<u>Elevation Date</u>"); <u>provided</u> that, (x) if any Funding Advance or other fees or amounts shall then be due and payable or any other obligations are due and owing to Seller

    by Buyer, Buyer may not request an Elevation, and (y) if an Elevation would contravene any law, rule, order or regulation applicable to either Party, the other Party may not request an Elevation.

 15.2 Upon the Elevation Date, to the extent of such Elevation, (i) Buyer shall assume all of the Assumed Obligations, (ii) Seller shall have no further responsibility in respect of such Assumed Obligations and (iii) this Agreement shall terminate except as provided in the last sentence of Section 16.

 15.3 At the time of Elevation, Buyer and Seller shall each pay its applicable share of any applicable Elevation Transfer Fee, as specified in Section G.1 of the Transaction Specific Terms. Notwithstanding the foregoing, the occurrence of an Elevation shall not affect (a) each Party's rights or obligations under this Agreement, (b) the indemnities set forth in Section 6, in each case arising on or before the Elevation Date, including, without limitation, any rights or obligations relating to a Party's breach of any of its representations, warranties, covenants or agreements hereunder, (c) Seller's obligation to deliver to Buyer any Distributions (whether received before on or after the Elevation Dare) pursuant to Section 8 of this Agreement or (d) either Party's right to reimbursement of Agent Expenses pursuant to Section7.1.

12. In February of 2025, Plaintiffs learned that Naked Juice was entering into discussions with the Credit Agreement lenders and third parties regarding a proposed management lability exercise ("LME") pursuant to which the Credit Agreement was to be restructured and amended to incorporate the LME (the "Amended Credit Agreement").

13. In addition, the Defendant also was a lender to Naked Juice under a Revolving Credit Agreement which was to be included and restructured in the LME (the "Revolving Credit Agreement") .

14. Under the proposed Amended Credit Agreement, *inter alia*, the Credit Agreement lenders were to be classified into three (3) groups – (a) the Ad Hoc Lender Group; (b) the Non-Ad Hoc Lender Group; and (c) lenders without membership in either the Ad Hoc Lender Group or the Non Ad Hoc Lender Group (the "No Membership Group").

15. Under the proposed LME in the Amended Credit Agreement, the Ad Hoc Lender Group would receive materially better economic and repayment terms than the Non-Ad Hoc Lender Group and the No Membership Group. The respective proposed economic and repayment terms of the members of the Ad Hoc Lender Group, the Non-Ad Hoc Lender Group and the No Membership Group were as follows:

(a) <u>Ad Hoc Lender Group</u>: The principal amount each of the loans under the Credit Agreement would be reduced by 12% and then the members of the Ad Hoc Lender Group would receive 7.5% First Lien First Out and 80.5% First Lien Second Out; and

(b) <u>Non-Ad Hoc Lender Group</u>: The principal amount of each of the loans under the Credit Agreement would be reduced by 30% and then members of the Non-Ad Hoc Lender Group would receive 35% First Lien Second Out and 35% First Lien Third Out.

(c) <u>No-Membership Group</u>: The principal amount of each of the loans would not be discounted however, the first lien of each loan would be stripped and relegated to fourth lien status at the very bottom of the debt stack.

16. If the UBS Loan was included in the Ad Hoc Lender Group, the value of the Plaintiff's Participation Interests would be at least $1,153,706 greater than if the UBS Loan was included in the Non-Ad Hoc Group and $1,268,250 greater than if the UBS Loan was in the No Membership Group.

17. Upon information and belief, the UBS Loan was one of the largest single loans to Naked Juice under the Credit Agreement constituting six to eight percent (6%-8%) of the entire loan amount under the Credit Agreement.

18. Section 12 of the Participation Agreements requires the Defendant to exercise the same duty of care in the administration and enforcement of the Participation Interests as if the Participation Interests were held by the Defendant. Given Defendant's status as one of the larger lenders under the Credit Agreement, and the corresponding bargaining power that such status conferred, Plaintiff reasonably expected Defendant to obtain membership in the Ad Hoc Lender Group.

19. Beginning in February of 2025 and continuing throughout April of 2025, Plaintiff repeatedly requested that UBS obtain membership for the UBS Loan in the Ad Hoc Lender Group in order to secure more favorable economic and repayment terms for the Participation Interests under the proposed Amended Credit Agreement.

20. In reply to Plaintiff's requests to have the UBS Loan- and the Participation Interests included in the Ad Hoc Lender Group, Plaintiff was advised by Jason Adler of the Defendant that "Naked Juice would not return phone calls."

21. On or about April 11, 2025, pursuant to Section 11 of the Participation Agreements, Defendant solicited Plaintiff's vote on whether to accept membership in the Amended Credit Agreement solely as a member of the Non-Ad Hoc Lender Group and not as a member of the Ad Hoc Lender Group.

22. Before casting its vote on whether to accept the Amended Credit Agreement and join the Non-Ad Hoc Lender Group, Plaintiff repeatedly sought information—consistent with inquiries it had been making since February 2025—regarding what efforts Defendant had undertaken to secure membership in the Ad Hoc Lender Group. Defendant, however, provided no response.

23. In view of UBS's failure to take any meaningful steps to secure membership in the Ad Hoc Lender Group, Plaintiff was forced into a Hobson's Choice: either forego membership in the Non-Ad Hoc Lender Group altogether (the No Membership Group) or accept the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group. Given that even the Non-Ad Hoc Lender Group offered more favorable repayment terms than the No Membership Group — albeit far less favorable than those available to Ad Hoc Lender Group—Plaintiff had no practical alternative but to vote in favor of the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group.

24. However, the majority holders of the UBS Loan participation interests voted not to accept membership in the Non-Ad Hoc Lender Group and therefore the UBS Loan was included in the No Membership Group as a result of which the Participation Interests would receive the economic and repayment terms afforded the No Membership Group as follows: the principal amount of Participation Interests were not discounted and the Participation Interests first lien was stripped and relegated to fourth lien status.

25. Confronted with the prospect of the paucity of repayment of the Participation Interests in the No membership Group, and given Defendant's woefully inadequate effort to gain membership in the Ad Hoc Lender Group, Plaintiff aligned with a group of direct lenders in the Credit Agreement (excluding UBS) to explore an elevation of Plaintiff's Participation Interests to a separate, divisible direct loan from the Plaintiff to Naked Juice pursuant to Section 15 of the Participation Agreements.

26. On or about April 21 and 22, 2025, Plaintiff informed UBS that Naked Juice agreed to elevate the Participation Interests to a separate, divisible direct loan from the Plaintiff to Naked Juice in the Amended Credit Agreement under the following terms – 20% reduction in the principal

amount of Plaintiff's Participation Interests and then Plaintiff would receive 75% First Lien Second Out and 25% First Lien Third Out (the "Plaintiff's Direct Loan").

27. The economic and repayment terms of the Plaintiff's Direct Loan were materially better than the economic and repayment terms Plaintiff would receive on account of the Participation Interests in the No Membership Group.

28. The value of the Plaintiff's Direct Loan was $636,352 greater than the value of the Participations Interests in the No Membership Group.

29. The Defendant, as required by Section 15 of the Participation Agreements, agreed to elevate Plaintiff's Participation Agreement to the Plaintiff's Direct Loan. This was confirmed in an email on April 21, 2025 from Paul Gilmore, Executive Director and General Counsel of UBS, to Arthur Roulac of the Plaintiff which states:

> "Arthur, Confirm Receipt. Great news.
>
> We can coordinate [the elevation of the Participation Interests to the Plaintiff's Direct Loan] with Latham [Naked Juice's counsel]."
>
> "We are communicating with Latham now to get this done as we can meet the noon deadline. Regards, PG."[Paul Gilmore of UBS]
>
> "Arthur, we have submitted all of the Exchange docs to Latham. They have confirmed receipt. We are just working with them now trying to arrange for the Exchange Loans [under the Amended Credit Agreement] to go directly to Three Court. If not they may go to UBS or Lender of Record first and then we assign to Three Court. We are just confirming how. Regards."
>
> "Arthur, we just heard that we will need to assign the Exchange Paper to Three Court after receiving it. Here is the message from Latham."
>
> "As a lender of record, you [UBS] will have to directly participate on behalf of Three Court and [_____]."
>
> "You will thereafter be able to assign the mix exchange consideration owed to each of them on your end pursuant to an assignment under the Super Priority Agreement."

30. Notwithstanding Plaintiff's express instructions that Defendant elevate the Participation Interests to Plaintiff's Direct Loan as required by Section 15 of the Participation Agreement—and Naked Juice's agreement with Defendant to effectuate that elevation—on or about April 23, 2024, Plaintiff was advised by PJT Partners, Naked Juice's restructuring agent, that the elevation of Plaintiff's Participation Interests to Plaintiff's Direct Loan could not be implemented because Defendant had accepted the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group.

31. The Defendant did not solicit a new vote from the Plaintiff regarding whether to accept or reject the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group as required under Section 11 of the Participation Agreements.

32. As a result of the Defendant's wrongful unilateral acceptance of the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group, Plaintiff's Participation Interests were relegated to repayment only on the terms afforded the Defendant in its capacity as a Non-Ad Hoc Lender Group member—terms materially less favorable than those Plaintiff would have received had the Defendant properly elevated the Plaintiff's Participation Interests to Plaintiff's Direct Loan with Naked Juice or secured membership in the Ad Hoc Lender Group.

33. By letter dated May 14, 2025 ("Plaintiff's Demand Letter"), Plaintiff demanded damages and indemnification from the Defendant under the Participation Agreements due to Defendant's multiple breaches of the Participation Agreements including, *inter alia*, (i) Defendant's breach of its Standard of Care pursuant to Section 12 of the Participation Agreements by failing to seek and gain membership in the Ad Hoc Lender Group; (ii) Defendant's failure to elevate the Participation Interests to the Plaintiff's Direct Loan in breach of Section 15 of the Participation Agreements; and (iii) Defendant's failure to solicit and obtain Plaintiff's new vote

with respect to the Defendant's acceptance of the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group notwithstanding that the majority of participants of the UBS Loan had previously voted to reject the Amended Credit Agreement, in breach of Section 11 of the Participation Agreements.

34. By letter dated June 5, 2025 (the "June 5 Letter"), Defendant responded to Plaintiff's Demand Letter and stated that (i) the Defendant had never sought to obtain membership in the Ad Hoc Lender Group; (ii) the Defendant was unaware of the terms of any deal being offered to an Ad Hoc Lender Group; (iii) the Defendant was never given the opportunity to participate in an Ad Hoc Group Lender Group; and (iv) the Defendant was prepared to deliver the Participation Interests to the Plaintiff only upon the terms afforded the Defendant as a member of the Non-Ad Hoc Lender Group.

35. Bloomberg messages exchanged between February and April 2025 between Arthur Roulac of Plaintiff and Jason Adler of Defendant demonstrate that the assertions in Defendant's June 5 Letter were false. These communications confirm that Defendant was fully aware of the existence of the Ad Hoc Lender Group and of Plaintiff's repeated requests that Defendant join the Ad Hoc Lender Group in order to secure more favorable economic and repayment terms for the UBS Loan and Plaintiff's Participation Interests.

36. Having wrongfully confined Plaintiff to the inferior terms of the Non-Ad Hoc Lender Group under the UBS Loan, Defendant has compounded its misconduct by failing to even deliver to the Plaintiff its Participation Interests as a member of the Non-Ad Hoc Lender Group and by cutting off Plaintiff's access to the Amended Credit Agreement Loan Portal.

37. Upon information and belief, the Defendant prioritized and received favorable economic and repayment terms under the Revolving Credit Agreement at the expense of and to the detriment of the repayment of Plaintiff's Participation Interests.

### First Cause of Action Against Defendant
### (Breach of Standard of Care)

38. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "37" as if more fully set forth at length herein.

39. Pursuant to Section 12 of the Participation Agreements, Defendant is required to exercise the same duty of care in the administration of the Participation Interests as it would exercise if the Defendant held the Participation Interests for its own account.

40. Over seventy percent (70%) of all the lenders in the Credit Agreement gained membership in the Ad Hoc Lender Group. .

41. Defendant's failure to make any genuine effort and gain membership in the Ad Hoc Lender Group to obtain more favorable economic and repayment terms for the Participation Interests—first excusing its inaction by claiming that Naked Juice would not return phone calls, and later falsely asserting that it was unaware of the terms of any deal being offered to the Ad Hoc Lender Group—constitutes a breach of the express terms of Section 12 of the Participation Agreements which requires the Defendant to exercise the same duty of care in administering Plaintiff's Participation Interests as it would have exercised if the Defendant held the Participation Interests for its own account.

42. Plaintiff has fully performed under the Participation Agreement.

43. By virtue of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but in no event less than $2,882,676.

## Second Cause of Action Against the Defendant
### (Breach of Standard of Care, Bad Faith, Gross Negligence and Willful Misconduct)

44. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "43"as if more fully set forth at length herein.

45. Defendant's failure to make any genuine effort to and gain membership in the Ad Hoc Lender Group to obtain more favorable economic and repayment terms for the Participation Interests- first excusing its inaction by claiming that Naked Juice would not return phone calls, and then falsely asserting that it was unaware of the terms of any deal being offered to the Ad Hoc Lender Group- has resulted in losses to the Plaintiffs due to the Defendant's bad faith, gross negligence and /or willful misconduct in breach of the express terms of Section 12 of the Participation Agreements which requires the Defendant to exercise the same duty of care in administering Plaintiff's Participation Interests as it would have exercised if the Defendant held the Participation Interests for its own account.

46. By virtue of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but in no event less than $2,882,676..

## Third Cause of Action
### (Breach of Agreement to Elevate Participation Interests)

47. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "46" as if more fully set forth at length herein.

48. Pursuant to Section 15 of the Participation Agreements, the Defendant was required to use commercially reasonable efforts and take such actions as are necessary as soon as reasonably practicable, to elevate the Participation Interests to the Plaintiff's Direct Loan.

49. Plaintiff, Defendant and Naked Juice agreed to elevate the Participation Interests to the Plaintiff's Direct Loan.

50. Defendant's failure to elevate the Participation Interests to the Plaintiff's Direct Loan constitutes a breach of Section 15 of the Participation Agreements.

51. By virtue of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but in no event less than $2,290,868.

**Fourth Cause of Action**
**(Failure to Solicit Plaintiff's Vote)**

52. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "51" as if more fully set forth at length herein.

53. In or about April 11, 2025, Defendant solicited votes from the UBS Loan participants which resulted in the rejection of the Amended Credit Agreement and the rejection of Defendant's membership of the UBS Loan in the Non-Ad Hoc Lender Group.

54. Under the terms of Section 11 of the Participation Agreement, Defendant could not thereafter accept the Amended Credit Agreement and membership in the Non-Ad Hoc Lender Group without soliciting a new vote and obtaining approval from the majority of the total amount of the UBS Loan participants including the Plaintiff.

55. Defendant's unilateral acceptance of the Amended Credit Agreement and membership in the Non-Ad Hoc Lender Group- after the total amount of the UBS loan participants had previously voted to reject the Amended Credit Agreement and membership in the Non-Ad Hoc Lender group-  without soliciting a new vote and obtaining approval from the majority of the total amount of the UBS Loan participants, including the Plaintiff, constitutes a breach of Paragraph 11 of the Participation Agreements which requires UBS to only act in accordance with the direction of participants holding a majority of the total amount of UBS Loan.

56. By virtue of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but in no event less than $2,290,868.

**Fifth Cause of Action**
**(Failure to Deliver Plaintiff's Participation Interests)**

57. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "__" through "56" as if more filly set forth at length herein.

58. Defendant has failed and refused to deliver the Participation Interests to the Plaintiffs s member of the Non-Ad Hoc Lender Group and has cut off Plaintiff's access to the Amended Credit Loan Portal.

59. By virtue of the foregoing, the Plaintiff has been damaged in an amount to be determined at trial but in no event less than $1,781,787.

**Sixth Cause of Action**
**(Indemnification of Attorneys' Fees)**

60. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "59" as if more fully set forth at length herein.

61. Pursuant to Section 6 of the Participation Agreements, by virtue of Defendant's breaches of the Participation Agreement, Defendant is obligated to indemnify Plaintiff for, *inter alia*, all reasonable attorneys' fees, costs and expenses.

**WHEREFORE**, the Plaintiff demands judgment as follows:

(a) On the First Cause of Action, an amount to be determined at trial but in no event less than $2,882,676.

(b)     On the Second Cause of Action, an amount to be determined at trial but in no event less than $2,882,676.

(c)     On the Third Cause of Action, an amount to be determined at trial but in no event less than $2,290,868.

(d)     On the Fourth Cause of Action, an amount to be determined at trial but in no event less than $2,290,888.

(e)     On the Fifth Cause of Action, an amount to be determined at trial but not less than $1,781,787.

(f)     On the Sixth Cause of Action, indemnifying Plaintiff for all costs and expenses including reasonable attorneys' fees, costs and expenses; and

(i)     On all causes of action, interest and for such other and further relief as this Court deems just and proper.

Dated:  White Plains, New York
        September 16, 2025

LAW OFFICES OF MARTIN EISENBERG

Martin Eisenberg/s/
Martin Eisenberg
50 Main Street, Suite 1000
White Plains, New York 10606
(914) 682-2044 (Office)
(914) 682-7784 (Fax)
me@martineisenberglaw.com

Attorneys for Plaintiff
Three Court Master, L.P.