USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 
DATE FILED: 9/28/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THREE COURT MASTER, L.P.,

Plaintiff,

-against-

UBS AG, STAMFORD BRANCH,

Defendant.

25-CV-07679 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiff Three Court Master, L.P. ("Three Court Master") brings this action against Defendant UBS AG, Stamford Branch ("UBS"), alleging six causes of action for various breaches of loan participation agreements between Plaintiff and UBS. UBS moves to dismiss the first and second causes of action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion to dismiss is DENIED.

## BACKGROUND

### I. RELEVANT FACTS[1]

Plaintiff and UBS entered into three loan participation agreements between September 2024 and December 2024 (the "Participation Agreements"), under which Plaintiff became a minority participant in UBS's loan to Naked Juice LLC ("Naked Juice") (the "UBS Loan"). Compl. ¶¶ 6–8; *see also* Dkt. Nos. 14-1, 14-2 & 14-3. The Participation Agreements granted

[1] The following facts are taken from the allegations in the Complaint, Dkt. No. 6 ("Compl."), as well as documents referenced therein, and are assumed true for the purposes of this motion. *See Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (when ruling on Rule 12(b)(6) motions to dismiss, courts may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993) (in deciding a Rule 12(b)(6) motion, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken").

Plaintiff participation interests in the UBS Loan, in the aggregate amount of $4,242,348.94 (the "Participation Interests"). Compl. ¶¶ 6–9.

The Participation Agreements incorporate and are governed by the Standard Terms & Conditions of the Loan Syndication and Trading Association (the "Standard Terms"). *Id.* ¶ 10; *see also* Dkt. No. 14-4 ("ST&C"). Section 12 of the Standard Terms is titled "Standard of Care," and Section 12.1 states, in relevant part:

> [UBS] will not be held to the standard of care of a fiduciary but will exercise the same duty of care in the administration and enforcement of the Participation and the Transferred Rights it would exercise if it held the Transferred Rights solely for its own account, and except for losses that result from [UBS's] bad faith, gross negligence, willful misconduct or breach of any of the express terms and provisions of this Agreement, it shall not be liable for any error in judgment or for any action taken or omitted to be taken by it.

Compl. ¶ 11; *see also* ST&C at 19. Section 12.2 of the Standard Terms contains a clause (vii) which states UBS "shall have no duties or obligations hereunder other than those expressly provided for herein." Compl. ¶ 11; *see also* ST&C at 19.

In February 2025, Plaintiff learned Naked Juice was negotiating a refinancing of its debt with various lenders, including UBS, through a liability management exercise ("LME") that was to be implemented via a restructured credit agreement (the "Amended Credit Agreement"). Compl. ¶ 12. Under the proposed Amended Credit Agreement, existing lenders were to be classified into three groups: (1) the Ad Hoc Lender Group who would receive the most favorable economic and repayment terms; (2) the Non-Ad Hoc Lender Group who would receive the next best terms; and (3) the No Membership Group who would receive the least favorable terms. *Id.* ¶¶ 14–15. According to Plaintiff, if the UBS Loan was included in the Ad Hoc Lender Group, the value of Plaintiff's Participation Interests would have been at least $1,153,706

greater than if the UBS Loan was included in the Non-Ad Hoc Lender Group, and at least $1,268,250 greater than if the UBS Loan was in the No Membership Group. *Id.* ¶ 16.

Beginning February 2025, when it first became aware of the LME, Plaintiff repeatedly requested that UBS obtain membership for the UBS Loan in the Ad Hoc Lender Group, but was advised by UBS that Naked Juice would not return phone calls. *Id.* ¶¶ 19–20. In April 2025, UBS solicited the votes of Participation Interest holders, including Plaintiff, on whether to accept the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group. *Id.* ¶ 21. Before casting its vote on whether to accept the restructuring as a member of the Non-Ad Hoc Lender Group, Plaintiff repeatedly sought information consistent with its earlier inquiries regarding UBS's efforts to secure membership in the Ad Hoc Lender Group, but UBS did not respond to Plaintiff's requests. *Id.* ¶ 22.

Confronted with the choice of accepting the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group or alternatively, as a member of the No Membership Group which offered materially worse terms, Plaintiff "had no practical alternative but to vote in favor of the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group." *Id.* ¶ 23. Notwithstanding Plaintiff's vote, a majority of the holders of the Participation Interests in the UBS Loan voted not to accept membership in the Non-Ad Hoc Lender Group, thereby relegating the UBS Loan to the No Membership Group. *Id.* ¶ 24.

Before the restructuring was finalized, Plaintiff, along with other direct lenders of the UBS Loan (excluding UBS), explored an elevation of its Participation Interests to a separate direct loan from Plaintiff to Naked Juice, pursuant to Section 15 of the Standard Terms.[2] *Id.*

[2] Section 15.1 provides, in relevant part, that upon a valid election of elevation, "each Party agrees to use commercially reasonable efforts and to take such actions as are necessary . . . as soon as

¶ 25. Naked Juice and UBS agreed to elevate Plaintiff's Participation Interests to a direct loan. *Id.* ¶¶ 26–29.

Before the elevation could be fully effectuated, however, Plaintiff was informed by Naked Juice's restructuring agent that a direct loan was no longer possible because UBS had accepted the Amended Credit Agreement on behalf of the UBS Loan as a member of the Non-Ad Hoc Lender Group. *Id.* ¶ 30. UBS did not solicit a new vote from Plaintiff and other participating lenders regarding whether to accept or reject the Amended Credit Agreement as a member of the Non-Ad Hoc Lender Group. *Id.* ¶ 31. As a result, Plaintiff's Participation Interests were subject to the repayment terms afforded the members of the Non-Ad Hoc Lender Group—terms materially less favorable than those Plaintiff would have received had UBS properly elevated Plaintiff's Participation Interests to a direct loan or secured membership in the Ad Hoc Lender Group for the entire UBS Loan. *Id.* ¶ 32.

In response to Plaintiff's demand letter, UBS stated it was unaware of the repayment terms offered to the Ad Hoc Lender Group, was never given an opportunity to participate in the Ad Hoc Lender Group, and was prepared to deliver Plaintiff's Participation Interests only upon the terms afforded the UBS Loan as a member of the Non-Ad Hoc Lender Group. *Id.* ¶¶ 33–34. Plaintiff disputes these assertions, and alleges UBS was fully aware of the existence of the Ad Hoc Lender Group and Plaintiff's repeated requests to secure membership in that group. *Id.* ¶ 35. Plaintiff claims UBS prioritized and received favorable repayment terms for a separate revolving credit facility under which UBS was a direct lender to Naked Juice and which was also

---

reasonably practicable, to cause [Plaintiff] . . . to become a Lender under the Credit Agreement with respect to all or any part of the Transferred Rights." Compl. ¶ 11; *see also* ST&C at 20.

included and restructured in the LME, at the expense of Plaintiff's Participation Interests. *Id.* ¶¶ 13, 37.

## II. PROCEDURAL HISTORY

Plaintiff filed this action on September 16, 2025. Dkt. No. 1. Shortly thereafter, the case was reassigned to the undersigned. UBS moved to dismiss Plaintiff's first and second causes of action pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. Nos. 12, 13 ("UBS Br.") & 14. The first cause of action alleges a breach of the standard of care embodied in Section 12 of the Participation Agreements, Compl. at 14, and the second cause of action alleges a breach of the standard of care, bad faith, gross negligence, and willful misconduct in failing to meet its obligations under Section 12 of the Participation Agreements, *id.* at 15. The motion is now fully briefed and before the Court for decision. *See* Dkt. Nos. 22 ("Opp."), 23 ("UBS Reply").

# DISCUSSION

## I. LEGAL STANDARD ON A MOTION TO DISMISS A BREACH OF CONTRACT CLAIM

In reviewing a motion to dismiss a breach of contract claim pursuant to Rule 12(b)(6), a court may interpret a contract properly before it, but must resolve all ambiguities in the contract in the plaintiff's favor. *See, e.g.*, *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328–29 (S.D.N.Y. 2010)..[3] "While this standard of review favors the plaintiff, it is not so liberal that a 'threadbare' recital of the elements of a claim, 'supported by mere conclusory statements,' can suffice to defeat a motion to dismiss." *Interpharm, Inc. v. Wells Fargo Bank*, 655 F.3d 136, 141 (2d Cir. 2011) (quoting *Mortimer Off Shore Servs. v. Fed. Republic of Germany*, 615 F.3d 97, 114 (2d Cir. 2010)). To the contrary, a complaint must contain enough "factual content" to

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, a court is "not constrained to accept the allegations of the complaint in respect of the construction of the [a]greement." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Instead, where certain contracts are integral to the complaint, a court may consider those documents when assessing the merits of the motion to dismiss. *See, e.g.*, *Interpharm*, 655 F.3d at 141.

Under New York law, a plaintiff alleging breach of contract must show "(l) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). "[T]he initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996). A written contract must be interpreted according to the parties' intent, which is, in the first instance, "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, 478 B.R. 570, 586 (S.D.N.Y. 2012). In a dispute over the meaning of a contract, the threshold question is "whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008). "[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012). "Ambiguity with respect to the

meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language." *Alexander & Alexander*, 136 F.3d at 86. However, contract language is "unambiguous when it has a definite and precise meaning and where there is no reasonable basis for a difference of opinion." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997). Further, a court must avoid any interpretation of contractual language that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11-CV-08440 (PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012).

Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss. *See Rounds v. Beacon Assocs. Mgmt. Corp.*, No. 09-CV-06910 (LBS), 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009). But "when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal" on a Rule 12(b)(6) motion. *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007).

## II. SECTION 12 OF THE STANDARD TERMS IS AMBIGUOUS, PRECLUDING DISMISSAL

In pleading its first and second causes of action, Plaintiff relies on Section 12.1 of the Standard Terms, which it alleges UBS violated by failing to "make any genuine effort and gain membership in the Ad Hoc Lender Group to obtain more favorable economic and repayment terms for the Participation Interests." Compl. ¶¶ 41, 45. As noted above, Section 12.1 provides that UBS "will exercise the same duty of care in the administration and enforcement of the Participation and the Transferred Rights it would exercise if it held the Transferred Rights solely for its own account." *Id.* ¶ 11; *see also* ST&C at 19.

UBS argues that the first and second causes of action fail to state a claim for relief because both "seek to impose duties on UBS that are not contained in the parties' agreements and directly contradict their express terms." UBS Br. at 2. Specifically, UBS argues that there is nothing in Section 12 (nor any other contractual provision) that "required UBS to seek and obtain the restructuring terms that Plaintiff allegedly wanted." *Id.* at 5. Thus, according to UBS, Plaintiff's claim that UBS breached the Standard of Care in Section 12 is precluded by the express language of Section 12.2(vii), which provides that UBS "shall have no duties or obligations hereunder other than those expressly provided for" in the Standard Terms. *Id.* at 7.

In response, Plaintiff argues that the Standard of Care is itself a bargained-for contractual provision that "create[s] broad, express affirmative obligations that apply across all conduct, including events not specifically enumerated." Opp. at 10–11. Plaintiff also contends that even if Section 12.2(vii) forecloses applying the Standard of Care beyond the duties and obligations expressly enumerated in the Standard Terms, UBS breached its affirmative obligation to conduct a participant vote under Section 11, to which the Standard of Care applies. *Id.* at 14.

There is no dispute that a breach of contract claim under New York law[4] must be based on a defendant's failure to perform an actual contractual obligation. *See, e.g.*, *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 98 N.E.3d 720, 723 (N.Y. 2018). However, upon considering the plain language of the Participation Agreements, the Court finds that Section 12 is ambiguous as to whether, as Plaintiff argues, the Standard of Care "create[s] broad, express affirmative obligations that apply across all conduct, including events not specifically

[4] Section 24 of the Standard Terms provides, in relevant part, that "this agreement, the rights and obligations of the parties under this agreement and any claim or controversy . . . arising out of this agreement or the transaction . . . shall in all respects be governed by and interpreted, construed and determined in accordance with, the internal laws of the State of New York." ST&C at 22.

enumerated," Opp. at 10, or whether, as UBS argues, it applies "only to UBS's express duties under the Participation Agreements," UBS Br. at 6. To resolve the parties' interpretive dispute, the Court would need to examine extrinsic evidence to determine the parties' intent in drafting the provision—an examination inappropriate at this stage of the litigation. *See Bayerische Landesbank*, 692 F.3d at 56 ("[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered, and in the context of a motion to dismiss, if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings.").

UBS's arguments to the contrary are unavailing. As an initial matter, there is no express language limiting the application of the Standard of Care only to the duties and obligations "expressly provided for" in the Participation Agreements. *See Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 647 N.E.2d 1298, 1303 (N.Y. 1995) ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the rewriting of their contract and the imposition of additional terms."). Section 12.1 plainly states, without qualification, that UBS will exercise the "same duty of care in the administration and enforcement of the Participation and the Transferred Rights it would exercise if it held the Transferred Rights solely for its own account." Compl. ¶ 11; *see also* ST&C at 19. UBS's briefs cite generally to black-letter law on traditional principles of contract interpretation, *see* UBS Br. at 5–6; UBS Reply at 2–3, but these, without more, do not explain why Section 12.2(vii) should

be interpreted unambiguously as a "deliberate contractual limitation" on the Standard of Care, UBS Reply at 2.

UBS argues that Plaintiff's reading would render the limiting language in Section 12.2(vii) meaningless, in violation of the well-established rule that a contract must be read to give effect and meaning to every term. *See* UBS Reply at 2–3. But Plaintiff's reading plausibly "gives meaning to every provision of the contract." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008). Under Section 12.2(vii), UBS may have no "duties or obligations . . . other than those expressly provided for" in the Participation Agreements, but the Standard of Care set forth in Section 12.1 plausibly imposes an express "duty" or "obligation" to act with the same care it would exercise if acting for its own account when it administers and enforces the Participation and Transferred Rights. Compl. ¶ 11; *see also* ST&C at 19. Moreover, UBS' proffered reading would arguably render superfluous the language in Section 12.1 that states UBS can be held liable for losses resulting from its "bad faith, gross negligence, [or] willful misconduct" in addition to losses resulting from its "breach of any of the express terms and provisions of this Agreement." Compl. ¶ 11; *see also* ST&C at 19.

In sum, because UBS has not shown that Section 12 is unambiguous in a way that supports only its interpretation, dismissal is improper..[5] *See Wurtsbaugh v. Banc of Am. Sec.*

[5] The Court need not, and does not, address Plaintiff's alternative argument that even if UBS is correct that Section 12 unambiguously applies only to UBS's express duties under the Participation Agreements, the motion to dismiss should be denied because UBS breached the Standard of Care with respect to its affirmative obligation under Section 11. *See* Opp. at 14–15. To the extent UBS argues that dismissal is warranted because it satisfied its contractual duty of care, *see* UBS Reply at 3–5, that is a question of fact not appropriate for resolution on a motion to dismiss. *See Home Point Fin. Corp. v. Bliss Home Funding Corp.*, No. 19-CV-05946 (PKC) (CLP), 2020 WL 3256301, at *4 (E.D.N.Y. June 16, 2020) ("[Defendant's] disagreement over its contractual duty and the fulfillment thereof is a factual dispute that the Court will not resolve on a motion to dismiss." (citing *Ray v. Weit*, 708 F. App'x 719, 722 (2d Cir. 2017))); *cf. Royal Bank of Canada v. Interfirst Bank Fort Worth, N.A.*, No. 84-CV-00161, 1988 WL 192369, at *7 (N.D. Tex. Apr. 4, 1988) (holding that a plaintiff's factual allegations were enough to survive summary judgment because "a reasonable jury could find that [the defendant's] alleged actions violated a contractual duty to exercise the same care with [the plaintiff's] money as [the defendant]

*LLC*, No. 05-CV-06220 (DLC), 2006 WL 1683416, at *5 (S.D.N.Y. June 20, 2006) ("Where a contract term is ambiguous and material to the breach of contract claim, the claim may not be dismissed for failure to state a claim.").

## III. THE FIRST CAUSE OF ACTION WILL NOT BE DISMISSED AS DUPLICATIVE OF THE SECOND AT THIS STAGE

UBS argues that Plaintiff's first cause of action fails for the additional reason that it is barred by the limitation of liability contained in Section 12 of the Standard Terms. UBS Br. at 7 n.2. It is not clear that this is an "additional" reason beyond what UBS has already argued about the correct interpretation of the Participation Agreements. But to the extent that this point is meant to argue that the first and second causes of action are duplicative, the Court declines to dismiss either count at this stage.

While Plaintiff's first and second causes of action appear nearly identical, they differ in an important respect. The first cause of action alleges that UBS's "failure to make any genuine effort and gain membership in the Ad Hoc Lender Group to obtain more favorable economic and repayment terms for the Participation Interests . . . constitutes a breach of the express terms of Section 12." Compl. ¶ 41. The second cause of action similarly asserts that UBS's "failure to make any genuine effort to and gain membership in the Ad Hoc Lender Group . . . has resulted in losses to [Plaintiff] due to [UBS's] bad faith, gross negligence and/or willful misconduct in breach of the express terms of Section 12." *Id.* ¶ 45. Both causes of action seek the same amount of damages. *Id.* ¶¶ 43, 46.

---

exercised with [its] own money"); *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 496 (S.D.N.Y. 2012) ("Whether and to what extent [the defendant] breached . . . the terms of the Participation Agreement [is a] material question[] of fact for the jury to decide.").

However, a viable interpretation of these claims is that the first cause of action alleges losses arising from a breach of one of the "express terms and provisions"—namely, in Plaintiff's view, the explicit duty to exercise the same care in administering the Participation Interests that UBS would exercise for its own account. *See* Compl. ¶ 11 (Section 12.1). And the second cause of action alleges losses arising from UBS' "bad faith, gross negligence, and willful misconduct," as an alternative theory of breach under Section 12.1, which could arguably be asserted even if the general duty of care did not qualify as an "express term[] [or] provision." *Id.* Although clearly Plaintiff could not recover the same damages under more than one theory at summary judgment or trial, parties are permitted to plead alternative legal theories to establish a breach of contract, and the question of whether the claims are duplicative or whether a limiting instruction on damages is necessary is a question best left for summary judgment or trial.

**CONCLUSION**

For the reasons set forth above, the motion to dismiss is DENIED. The Clerk of Court is respectfully directed to terminate Dkt. No. 12.

Dated: September 28, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge